IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORTHOFLEX, INC. d/b/a/ | § | |
| INTEGRATED ORTHOPEDICS, et al., | § | |
| | § | |
| Plaintiffs-Counterdefendants, | § | |
| | § | Civil Action No. 3:11-CV-0870-D |
| VS. | § | (Consolidated with |
| | § | Civil Action No. 3:10-CV-2618-D) |
| | § | |
| THERMOTEK, INC., | § | |
| | § | |
| Defendant-Counterplaintiff- | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| MIKE WILFORD, | § | |
| | § | |
| Consolidated Defendant, | § | *The memorandum opinion and order was filed unsealed |
| | § | on December 10, 2013 after the parties agreed that no part |
| VS. | § | needed to remain under seal. |
| | § | |
| WMI ENTERPRISES, LLC, et al., | § | |
| | § | |
| Third-Party Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this memorandum opinion and order, the court addresses seven motions to strike

expert testimony.

I

As a result of the proceedings and rulings in these consolidated cases, the following

claims remain for trial: (1) the claims of Motion Medical Technologies, LLC ("Motion

Medical"), Wabash Medical Company, LLC ("Wabash Medical"), Mike Wilford

("Wilford"), Tri 3 Enterprises, LLC ("Tri 3"), and Orthoflex, Inc., d/b/a Integrated Orthopedics ("Orthoflex") (collectively, "plaintiffs")[1] against ThermoTek, Inc. ("ThermoTek") for breach of express warranty; (2) ThermoTek's counterclaim against Wilford for fraud; (3) ThermoTek's counterclaim-third-party claim against Motion Medical, Wabash Medical, and Tri 3 for breach of contract; (4) ThermoTek's third-party claim against Melissa Wojcik ("Wojcik") for breach of contract; and (5) ThermoTek's counterclaim-third-party claim against Wilford, Wojcik, and Thermo Compression Solutions, LLC ("TCS, LLC") for unfair competition.

The following motions are pending for decision: (1) ThermoTek's January 4, 2013 motion to strike expert testimony of Scott Yates ("Yates"); (2) ThermoTek's January 4, 2013 motion to strike portions of the expert testimony of William Durako ("Durako"); (3) ThermoTek's January 4, 2013 motion to strike portions of the expert testimony of Andre Vacroux ("Dr. Vacroux"); (4) ThermoTek's January 4, 2013 motion to strike expert testimony of David Venerus ("Dr. Venerus"); (5) plaintiffs' April 25, 2013 motion to strike portions of the proffered expert testimony of Karl Weisheit ("Weisheit"); (6) plaintiffs' May 1, 2013 motion to strike portions of the proffered expert testimony of Roch Shipley ("Dr. Shipley"); and (7) plaintiffs' May 1, 2013 motion to strike portions of the proffered expert testimony of Dr. Shipley in rebuttal to the claims of plaintiffs.

---

[1]As in prior memorandum opinions and orders in this case, the court refers to these parties collectively as "plaintiffs." *See, e.g., Orthoflex, Inc. v. ThermoTek, Inc.*, 2013 WL 3213311, at *1 (N.D. Tex. June 26, 2013). Plaintiffs' filings are cited as "Ps." filings, and ThermoTek's filings are cited as "D." filings.

II

"The court decides these motions in its role as gatekeeper under Fed. R. Evid. 702."

*SEC v. Cuban*, 2013 WL 3809654, at *1 (N.D. Tex. July 23, 2013) (Fitzwater, C.J.) (citing

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)) (citation omitted). "The court

may admit proffered expert testimony only if the proponent, who bears the burden of proof,

demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3)

the evidence is reliable." *Nunn v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2540754, at *2

(N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 147 (1999)).

The first requirement is that the expert be qualified. "Before a district court may

allow a witness to testify as an expert, it must be assured that the proffered witness is

qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"

*United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Rule 702). "A district

court should refuse to allow an expert witness to testify if it finds that the witness is not

qualified to testify in a particular field or on a given subject." *Id.* (citing *Wilson v. Woods*,

163 F.3d 935, 937 (5th Cir. 1999)). "Rule 702 does not mandate that an expert be highly

qualified in order to testify about a given issue. Differences in expertise bear chiefly on the

weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v.

Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citation omitted).

The second requirement is that the expert's testimony be relevant. To be relevant,

"expert testimony [must] 'assist the trier of fact to understand the evidence or to determine

a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Rule 702(d) (requiring that "expert has reliably applied the principles and methods to the facts of the case").

The third requirement is that the expert's testimony be reliable. "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Rule 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). Expert testimony "must constitute 'more than subjective belief or unsupported speculation.'" *Nunn*, 2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590). The court focuses on the expert's methodology, not the conclusions generated by it. *Id.* at *4 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997)). If, however, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998). This review is usually conducted by considering the five nonexclusive *Daubert* factors.[2] But these factors

---

[2]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and

"may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kumho*, 526 U.S. at 150.

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459. The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

### III

The court turns first to plaintiffs' May 1, 2013 motion to strike portions of the proffered expert testimony of Dr. Shipley.

---

publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

A

Plaintiffs move to strike portions of Dr. Shipley's testimony offered in support of ThermoTek's claims for fraud and unfair competition. ThermoTek intends to offer Dr. Shipley's testimony concerning the similarities between Wilford's wraps and ThermoTek's wraps to prove that Wilford did not merely reverse engineer ThermoTek's products. In support of his ultimate conclusion, Dr. Shipley intends to testify that Wilford's and ThermoTek's wraps are substantially equivalent and that the similarities between the two products suggest that Wilford must have used information he obtained from ThermoTek to create the competitor product.

Plaintiffs challenge this testimony on several grounds. They contend that Dr. Shipley is not qualified to offer an opinion about whether the information allegedly disclosed by ThermoTek was "confidential" or "proprietary" because he does not have any special expertise in deciding whether something is confidential or proprietary. They maintain that Dr. Shipley's testimony about the similarities between Wilford's and ThermoTek's products is not relevant because whether the products are "'substantially equivalent' . . . in the eyes of an 'ordinary observer' has no bearing on any issue [in this case]." Ps. 5/1/13 Br. Shipley 18. And assuming *arguendo* that his testimony is relevant, plaintiffs posit that the testimony is unreliable because Dr. Shipley focuses on the "functional aspects" of the product when the law requires that he focus on the "non-functional aspects." *Id.* at 19-20. Finally, plaintiffs contend that Dr. Shipley is not qualified to opine about the equivalence of the products because he is not a medical doctor and the products at issue are medical devices.

B

In their briefing on the motions to strike, plaintiffs repeatedly misstate how the law applies to ThermoTek's claims.  To prevail on its fraud claim against Wilford, ThermoTek must prove that (1) he made a material representation; (2) it was false when made; (3) he knew the representation was false, or he made it recklessly, without knowledge of its truth and as a positive assertion; (4) he made the representation with the intent that ThermoTek should act upon it; and (5) ThermoTek acted in reliance upon it and suffered injury as a result.  *See, e.g., Hoffman v. L&M Arts*, 2013 WL 4511473, at *1 (N.D. Tex. Aug. 26, 2013) (Fitzwater, C.J.) (citing *Beijing Metals & Minerals Import/Export Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1185 (5th Cir. 1993) (Texas law)).  To recover on its claim for unfair competition by common law misappropriation, ThermoTek must prove three elements: (1) the creation of ThermoTek's product through extensive time, labor, skill, and money; (2) Wilford's use of that product in competition with ThermoTek, thereby gaining a special advantage in that competition (i.e., a "free ride") because he was burdened with little or none of the expense incurred by ThermoTek; and (3) commercial damage to ThermoTek.  *See Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 839 (5th Cir. 2004) (citing *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App. 1993, writ denied)).  ThermoTek's unfair competition claim is not based on trade dress infringement.[3]

---

[3]The Lanham Act, 15 U.S.C. § 1125(1), establishes a federal cause of action for trade dress infringement.  *See Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351,

Plaintiffs make two principal mistakes in applying the law of fraud and unfair competition to ThermoTek's claims—errors that pervade many of their arguments in support of the motions to strike. First, they insist that ThermoTek's claims require proof that the information allegedly disclosed by ThermoTek was confidential or proprietary. For example, plaintiffs assert that "each of the for[e]going causes of action, at least as far as the expert report of Dr. Shipley is concerned, is inextricably tied to whether ThermoTek can establish that it has confidential and proprietary information[.]" Ps. 5/1/13 Br. Shipley 10. The court disagrees. Neither fraud nor unfair competition requires proof of any confidential or proprietary information. Whether the information was confidential or proprietary may be *relevant* to ThermoTek's unfair competition claim because the presence of ThermoTek's information in the public domain could undercut ThermoTek's position that Wilford gained a special advantage in competition (i.e., a free ride). But whether the information is confidential or proprietary is not an *essential* element of the claim. For example, even if

---

354-55 (5th Cir. 2002). "Trade dress" refers to "[t]he design or packaging of a product [that has] acquire[d] a distinctiveness which serves to identify the product with its manufacturer or source." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). Trade dress infringement occurs when someone uses trade dress "in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *Id.* The statute that creates the cause of action "expressly limits the scope of trade dress protection by providing that 'the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.'" *Eppendorf*, 289 F.3d at 355 (quoting 15 U.S.C. § 1125(a)(3)). Texas courts recognize a state-law cause of action for trade dress infringement that is substantially similar, if not identical, to its federal counterpart under the Lanham Act. *See KLN Steel Prods. Co. v. CNA Ins. Cos.*, 278 S.W.3d 429, 440-41 (Tex. App. 2008, pet. denied) ("Texas courts have acknowledged that the common law elements of unfair competition including trademark are no different than those under federal trademark law.") (citations and internal quotation marks omitted).

- 8 -

every individual piece of information that ThermoTek disclosed was in the public domain, producing, synthesizing, and delivering the information to Wilford could have saved him significant time and money in the research and development process, which in turn could have accelerated the speed with which the competitor products entered the market. This showing, if made by ThermoTek, could establish both that Wilford gained a special advantage in competition and that ThermoTek was commercially damaged—even if ThermoTek does not prove that the information was confidential or proprietary.[4]

Moreover, Dr. Shipley is not being offered to provide a legal opinion about whether the information is confidential or proprietary. Instead, he is being offered to provide an engineering opinion about the mechanical similarities between ThermoTek's and Wilford's products. To the extent Dr. Shipley mentions "confidential" or "proprietary" information, he is merely employing the labels ThermoTek uses to describe information about ThermoTek's product designs and manufacturing processes. Regardless whether ThermoTek's characterization of the information as confidential or proprietary is correct as a matter of law, Dr. Shipley's testimony is not being offered to address this question. The court therefore disagrees with plaintiffs that Dr. Shipley's testimony must be stricken on the ground that he is not qualified to render an opinion about whether certain information is confidential or proprietary.

---

[4]Notwithstanding its argument that it does not *need* to prove that the information was confidential or proprietary, ThermoTek has taken the position that the information was confidential or proprietary. The court expresses no view about that conclusion.

Plaintiffs' second error relates to the alleged similarities between ThermoTek's and Wilford's products.  Plaintiffs assert:

> Not a single element of any one of ThermoTek's remaining causes of action hinges on whether a particular product is "substantially similar" or "substantially equivalent" to another product.  Nor is any element affected by a determination that something was "plagiarized".  Indeed, neither of those inquiries has any bearing on any of the issues raised by ThermoTek's remaining claims.

Ps. 5/1/13 Br. Shipley 10 (footnote omitted).  The court disagrees.

Proof that Wilford's products and ThermoTek's products are substantially similar is circumstantial evidence that is relevant to several issues pertinent to ThermoTek's fraud and unfair competition claims.  For example, evidence of product similarity is relevant to the element of fraudulent intent, because it would permit the trier of fact to find that Wilford intended to deceive ThermoTek into disclosing information that he could use to create a competitor product.  It is also relevant to the element of special advantage, because it would permit the trier of fact to find that Wilford was able to free-ride—that is, use the information he obtained from ThermoTek, thereby avoiding the costs of original research and development.  Accordingly, the court declines to strike Dr. Shipley's testimony on the ground that evidence about product similarity is not relevant to any of ThermoTek's claims.

C

Plaintiffs also challenge the reliability of Dr. Shipley's testimony, contending that there is too great an analytical gap between his determination that Wilford's wraps are substantially equivalent to ThermoTek's wraps and his conclusion that Wilford used the

information disclosed by ThermoTek.  According to plaintiffs, this analytical gap exists because Dr. Shipley only analyzed Wilford's wraps with a ruler, scale, and microscope, and this analysis is too simplistic to support the conclusion that Wilford's wraps incorporate the information ThermoTek disclosed.  The court disagrees.

The simplicity of a study does not necessarily undermine its reliability.  Plaintiffs do not posit that the testing procedures were flawed, that the tools used to study the wraps were defective, or even that the measurements or data produced by Dr. Shipley were somehow inaccurate.  There is no general requirement that an expert use especially sophisticated tools to support an opinion.  The court therefore declines to accept plaintiffs' argument regarding the method of testing.

Plaintiffs also maintain that Dr. Shipley's testimony is not reliable because he applied the wrong legal standard in his analysis.  They contend that Dr. Shipley focuses only on functional features of Wilford's products when the law requires that he analyze non-functional features.  As far as the court can determine, plaintiffs have seized on Dr. Shipley's use of the phrases "substantially equivalent" and "eyes of the ordinary observer" to conclude that ThermoTek's claim is based on trade dress infringement.[5]  *Cf., e.g.,* Ps. 5/1/13 Br. Shipley 18 ("While it is true that one branch of . . . unfair competition law in Texas utilizes the substantial equivalence and eyes of the ordinary observer tests—namely, trade dress

_____

[5]*See KLN Steel*, 278 S.W.3d at 440-42 (recognizing claim for trade dress infringement under Texas law); *Eppendorf*, 289 F.3d at 354-55 (recognizing cause of action for trade dress infringement under federal law).

infringement . . .").  As a result, plaintiffs have conflated two different causes of action: trade dress infringement and common law misappropriation, which are two distinct species of unfair competition.   Trade dress infringement does not occur unless the defendant has infringed on non-functional aspects of the plaintiff's product. *See, e.g., Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) ("It is clear that functional product features do not qualify for trade dress protection.").  But ThermoTek's claim is based on common law misappropriation, not trade dress infringement.  Dr. Shipley's use of the phrases "substantially equivalent" or "eyes of the ordinary observer" does not transform the nature of ThermoTek's claim.  Accordingly, the court disagrees with plaintiffs' contention that Dr. Shipley's testimony is unreliable because he analyzed functional aspects of the products.

D

Plaintiffs also challenge Dr. Shipley's qualifications.  They maintain that he is not qualified to opine about the similarities of the products because they are medical devices and he is not a medical doctor.  This argument lacks force.

Dr. Shipley is not being offered to testify, for example, about the therapeutic effects of the products on a patient; ThermoTek is offering his testimony as a materials engineer about the mechanical aspects of the products.  Because plaintiffs have not raised any question about Dr. Shipley's qualifications as a materials engineer, and because his opinions relate to this area of expertise, there is no basis for the court to find that he is not qualified to opine about the design features of the products at issue.

E

Finally, plaintiffs maintain that Dr. Shipley's testimony relating to the activities of WMI Enterprises, LLC ("WMI") must be excluded because WMI is not a party to the lawsuit. Citing an inapposite case about mootness as it relates to actions for declaratory relief, plaintiffs posit that any testimony about WMI, a non-party, is irrelevant and must be stricken.

Contrary to plaintiffs' suggestion, testimony about non-parties is not categorically precluded. Plaintiffs' challenge essentially rests on the premise that testimony about a non-party is irrelevant in this case. But "[t]he standard for relevance is a liberal one." *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994). It is easily satisfied here, where ThermoTek has produced evidence that would enable a reasonable trier of fact to find that Wilford used WMI to manufacture and market wraps that WMI created based on information Wilford received from ThermoTek. Dr. Shipley examined the wraps that WMI manufactured and compared them to ThermoTek's wraps. ThermoTek intends to offer his testimony that the two wraps are substantially the same. This testimony is relevant to several issues in the case, including whether Wilford intended to defraud ThermoTek and whether Wilford caused commercial damage to ThermoTek. The court therefore concludes that Dr. Shipley's testimony is relevant because his reasoning properly can be applied to the facts at issue.

The court therefore denies plaintiffs' motion to strike portions of the proffered expert testimony of Dr. Shipley.

IV

The court turns next to plaintiffs' May 1, 2013 motion to strike portions of the proffered expert testimony of Dr. Shipley in rebuttal to the claims of plaintiffs.

A

ThermoTek offers Dr. Shipley as a rebuttal witness to testify that (1) Dr. Vacroux's opinion that ThermoTek's products were not fit for their intended purpose is incorrect, and (2) Dr. Vacroux's opinion about the failure rate of ThermoTek products is based on a flawed data set and an unreliable statistical methodology. Conclusory assertions aside,[6] plaintiffs do not challenge Dr. Shipley's qualifications as a rebuttal witness. Instead, plaintiffs argue that his rebuttal opinions should be excluded because he "fail[s] to employ relevant and reliable methodologies." Ps. 5/1/13 Br. Shipley-Rebuttal 13.

B

Plaintiffs first object to Dr. Shipley's rebuttal opinion challenging Dr. Vacroux's conclusion that ThermoTek's products were not fit for their intended purpose.[7] Plaintiffs

_____

[6]Plaintiffs state—without adequate explanation—that "Dr. Shipley is not qualified to render opinions as to 'design goals' of the VascuTherm machine." Ps. 5/1/13 Br. Shipley-Rebuttal 13. But plaintiffs do not specifically challenge Dr. Shipley's qualifications. It is undisputed that Dr. Shipley is a materials engineer with a Ph.D. in Metallurgical Engineering from the Illinois Institute of Technology and works as an engineer at Professional Analysis and Consulting, Inc., an engineering consulting firm. On the present record, there is no basis for the court to find that Dr. Shipley lacks the necessary qualifications to render opinions about engineering issues such as the design features of Wilford's products.

[7]Plaintiffs offer Dr. Vacroux's testimony in support of their claims for breach of express warranty and breach of implied warranty. *See* Ps. 2/7/13 Br. Vacroux 2-3. In *Orthoflex, Inc. v. ThermoTek, Inc.*, 2013 WL 4045206 (N.D. Tex. Aug. 9, 2013) (Fitzwater,

- 14 -

argue that Dr. Shipley's analysis is irrelevant on this issue because he tested the wrong device.  Dr. Shipley tested a ThermoTek wrap that was manufactured in 2006 but was retrofitted with a new polypropylene reservoir made of a different material from the original reservoir and a new cover for the power supply.  Plaintiffs maintain that, considering the differences between the test unit and the product at issue in the lawsuit, there is too great an analytical gap between the basis for Dr. Shipley's conclusion and his ultimate opinion that the products were not defectively designed.  ThermoTek responds that there is no analytical gap because Dr. Shipley acknowledged the modifications both in his expert report and in his deposition testimony.  Regarding the power supply cover in particular, ThermoTek emphasizes that Dr. Shipley performed tests that accounted for the modification, and he ultimately concluded that the presence of the cover made no difference to his ultimate conclusion.

Plaintiffs' arguments are inadequate to warrant excluding Dr. Shipley's rebuttal testimony.  Regarding the different reservoir material, plaintiffs fail to explain why the

---

C.J.), the court granted partial summary judgment to ThermoTek, dismissing plaintiffs' claims for breach of implied warranty and limiting the claim for breach of express warranty to defects in materials and workmanship.  *See id.* at *4-5.  Notwithstanding the summary judgment ruling, the court does not consider ThermoTek's motion to strike Dr. Vacroux's testimony to be moot.  Dr. Vacroux's testimony concerning alleged design defects is still relevant to ThermoTek's claims for fraud and unfair competition because a contested issue is whether Wilford's complaints about product failures were truthful.  As such, the court considers Dr. Vacroux's testimony as if it might be offered in Wilford's defense on the fraud and unfair competition claims.  Likewise, the court considers Dr. Shipley's testimony as if it might be offered to rebut Dr. Vacroux's testimony, even though there is no longer a claim for breach of implied warranty for fitness for a particular purpose.

change in material makes any difference to Dr. Shipley's conclusion. Plaintiffs neither identify any opinion that relies on the chemical composition of the reservoir material nor explain why this particular modification makes a material difference with respect to Dr. Shipley's testimony or the contested issues in the case. Plaintiffs rely on *Barnes v. General Motors Corp.*, 547 F.2d 275 (5th Cir. 1977), and *Hafstienn v. BMW of N. Am., LLC*, 194 Fed. Appx. 209 (5th Cir. 2006) (per curiam). This reliance is misplaced. In *Barnes* the Fifth Circuit held that the district court abused its discretion when it admitted crash test evidence and accompanying expert testimony because the test car had materially different features from the vehicle involved in the accident. *Barnes*, 547 F.2d at 277. In particular, the court noted that "[t]he contested issues . . . were whether the engine mount on the plaintiff's automobile separated prior to the accident and, if so, whether the roll-stop feature on the engine mount would have prevented the engine from lifting and binding the accelerator linkage . . . . The test car had no engine mounts or roll-stop feature." *Id.* Here, the material composition of the reservoir is not a contested issue, at least insofar as Dr. Shipley's testimony is concerned.[8] Consequently, the difference in reservoir material is not a *material*

---

[8]The material composition of the reservoir material is related to two contested issues. As discussed below, the parties dispute whether the reservoir material is compatible with the liquid used in the reservoir. But plaintiffs do not explain why Dr. Shipley's rebuttal testimony bears on this issue, and the court is unable to conclude that it does. Where other experts have addressed the issue, they have focused on the chemical composition of the *liquid*—not the material comprising the reservoir.

The second related issue is whether the reservoir was prone to leakage. Plaintiffs do not explain why Dr. Shipley's rebuttal testimony bears on this issue either, and the court is unable to conclude that it does. Where other experts have addressed the issue, they have focused on the reservoir's flange and cap—not the material comprising the reservoir.

difference, so there is no reason to conclude that Dr. Shipley's test fails to provide "a fair comparison in respect to the particular issue to which the test is directed." *Id.*

*Hafstienn* is distinguishable for the same reason. In *Hafstienn* the Fifth Circuit affirmed the district court's decision to exclude crash test evidence as irrelevant under Rule 401. The district court concluded for several reasons that the test vehicle was not "substantially similar" to the one involved in the crash in question, and that the crash test occurred under dissimilar conditions. *Hafstienn*, 194 Fed. Appx. at 212-13. The Fifth Circuit noted that there were several "material differences between the accident and the crash test." *Id.* at 213. Here, it is undisputed that Dr. Shipley analyzed the same model as the units at issue in this lawsuit. The test unit was designed and manufactured by ThermoTek, and, unlike in *Hafstienn*, the record does not establish that there are *material* differences between the unit Dr. Shipley analyzed and those at issue.

Plaintiffs' attempt to show that the power supply cover is a material difference is also insufficient. A contested issue in this case is whether leakage from the reservoir could cause the device to malfunction if it came into contact with the power supply. Plaintiffs argue that the introduction of a power supply cover is a material modification because it would prevent leaking reservoir liquid from coming into contact with the power supply. ThermoTek responds that Dr. Shipley fully recognizes this modification and accounts for it in his study. ThermoTek cites several passages from Dr. Shipley's expert report that address this issue. In one, Dr. Shipley states that, in several tests, leaking liquid did not come into contact with the power supply cover, even when the reservoir overflowed. In another passage, Dr.

Shipley explains that, in other tests where the reservoir was deliberately overfilled in a special mode, a "few droplets" came into contact with the cover but "[those] few droplets would not have created a problem."  D. 7/31/13 Br. Shipley-Rebuttal 11 (quoting expert report of Dr. Shipley at ¶ 18).

Expert testimony is not unreliable simply because there are differences between the test unit and the unit at issue.  *See, e.g., Barnes*, 547 F.2d at 277 (noting that conditions of experimental evidence need not be "precisely reproduced").  When there is a difference in experimental conditions, an expert's testimony is sufficiently reliable to be admissible if the difference is acknowledged by the expert and the expert can show that the methods and principles applied to the facts are nevertheless reliable.  *See Wackman v. Rubsamen*, 602 F.3d 391, 402-03 (5th Cir. 2010) (concluding that some analytical gaps, where acknowledged by the expert and explained, go to the weight of the evidence rather than to admissibility).  Here, Dr. Shipley opines that, *even if* the reservoir overflowed, only a small amount of liquid would come into contact with an uncovered power supply and that amount would not be enough to cause the problems described by Wilford and Dr. Vacroux.  This is a limited proposition about the effect of minimal liquid contact on the power supply; it does not depend on whether the device has a cover.  *See McCune v. Graco Children's Prods., Inc.*, 495 Fed. Appx. 535, 541 (5th Cir. 2012) (per curiam) (distinguishing *Barnes* and concluding that an experimental test concerning a "limited proposition" was admissible, even though test differed from accident at issue).  Moreover, it is clear from the record that Dr. Shipley ran several series of tests under varying conditions and that the tests yielded opinions that were

more than just subjective belief or unsupported speculation.  He did not ignore the presence of the power supply cover, and he tailored his opinions to account for the modification.  The court therefore concludes that any analytical gap between Dr. Shipley's opinion and the basis for his conclusion does not render his testimony unreliable.  Plaintiffs will be able to challenge Dr. Shipley's test design through vigorous cross-examination and the presentation of contrary evidence.  *See Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

C

Plaintiffs also object to Dr. Shipley's rebuttal testimony concerning the statistical analysis proffered by Dr. Vacroux.  Because the court is granting ThermoTek's motion to strike Dr. Vacroux's statistical opinion regarding the failure rate, *see infra* § VII(D), plaintiffs' request to strike Dr. Shipley's rebuttal testimony concerning Dr. Vacroux's failure rate calculations is denied as moot.

Thus the court denies plaintiffs' motion to strike Dr. Shipley's rebuttal testimony, in part on the merits and in part as moot.

V

The court now considers plaintiffs' April 25, 2013 motion to strike portions of the proffered expert testimony of Weisheit.

A

Plaintiffs move to strike Weisheit's testimony that is offered to support ThermoTek's damages claims and rebut plaintiffs' damages claims.  They do not challenge Weisheit's qualifications.  Instead, plaintiffs challenge the relevance and reliability of his testimony.

B

Plaintiffs first argue that Weisheit's damages calculations will not help the trier of fact determine any issue in dispute because none of the parties actually sells the competitor wraps. According to plaintiffs, WMI, currently a non-party who was previously dismissed for lack of *in personam* jurisdiction,[9] is the only company that sells the competitor wraps, so any damages calculation based on WMI's sales activity is irrelevant. The court disagrees.

As discussed in § III(E), testimony about a non-party is not categorically barred. The question is whether the evidence is relevant, and relevance is a liberal standard. *See Manville Sales*, 27 F.3d at 1093. Plaintiffs' objection misunderstands what the court perceives to be ThermoTek's theory of damages. ThermoTek maintains that, but for Wilford's tortious conduct, the distributor agreement ("Distributor Agreement") would have remained undisturbed and plaintiffs would have continued to purchase wraps from ThermoTek. Contrary to plaintiffs' suggestion, this theory ties the damages suffered by ThermoTek (lost sales revenue due to decreased sales volume) to the activity of a party in the case (Wilford).

As a separate theory, ThermoTek also posits that Weisheit, if given the opportunity to review sales data that had not been produced as of the date of his expert report, may revise his opinion in order to opine about other methods of calculating lost profits. Specifically, Weisheit intends to offer a damages estimate based on the sales that ThermoTek allegedly lost as a result of a competitor product's entry in the market. According to this theory,

---

[9]*See ThermoTek, Inc. v. WMI Enters., LLC*, 2011 WL 1485421, at *4 (N.D. Tex. Apr. 19, 2011) (Fitzwater, C.J.).

ThermoTek faced increased competition and sustained lost profits because of Wilford's tortious conduct.  Assuming it is based on reliable data and a proper methodology, this calculation would also be relevant because it ties damages suffered by ThermoTek to the conduct of a party in the case.  Thus the court declines to accept plaintiffs' argument that Weisheit's testimony must be stricken on the ground that it will not help the trier of fact; the relevance of either lost profits calculation does not depend on whether WMI is a party to this lawsuit.

C

Plaintiffs next contend that Weisheit's testimony concerning lost profits is unreliable because it is based on an assumption that is contradicted by the facts of record.  Plaintiffs argue that there is an analytical gap between Weisheit's opinion on lost sales and the basis for his conclusion because he erroneously assumes that ThermoTek's historical sales patterns would have remained constant.  According to plaintiffs, this assumption is incorrect because the record is clear that there are other changes that would have affected ThermoTek's sales, regardless of Wilford's actions: (1) ThermoTek canceled the Distributor Agreement; (2) ThermoTek doubled the price of its wraps; and (3) ThermoTek refused to sell additional VascuTherm machines.[10]  ThermoTek responds that all three changes occurred only because

_____

[10]Plaintiffs also argue that the court's ruling that the covenant not to compete in the Distributor Agreement is unenforceable, *see Orthoflex, Inc. v. ThermoTek, Inc.*, 2012 WL 2864510, at *6 (N.D. Tex. July 12, 2012) (Fitzwater, C.J.), renders Weisheit's assumption about historical sales patterns unreliable.  As far as the court can determine, Weisheit's calculations do not rely on the covenant not to compete.  If Weisheit offers at trial an opinion that is materially affected by the court's ruling, an objection can be made and addressed at

of the underlying conduct at the center of this litigation.  ThermoTek posits that, if not for the breach of contract, fraud, and unfair competition, ThermoTek would not have canceled the Distributor Agreement, would not have increased its prices, and would have continued selling VascuTherm machines at the same rate.

Plaintiffs' argument is insufficient to warrant excluding Weisheit's testimony concerning lost profits.  Weisheit's reliance on historical sales patterns is permissible because it is essentially an assumption limited to plaintiffs' liability.[11]  Experts are permitted to assume the fact of liability and opine about the extent of damages.  *See, e.g., U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F.Supp.2d 737, 741 (N.D. Ill. 2009) ("[The expert] is an expert on damages, not liability, and she seeks to opine only on what the damages should be *if* the jury separately finds the facts she assumes to be true." (emphasis in original)).  And plaintiffs will be able to cross-examine Weisheit on whether his damages calculations adequately account for other variables that may have caused a change in sales volume.  Their challenge goes to the weight of Weisheit's testimony, not its admissibility.  *See Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5; *see also Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 23-25 (5th Cir. 1974) (affirming decision to admit testimony from certified public accountant who had prepared net profit analysis based on assumption of liability, and noting that party objecting to expert testimony had opportunity on cross-

_____

that time.

[11]In his expert report, Weisheit explicitly recognizes the limited nature of his opinions. *See* Ps. 4/25/13 App. Weisheit 294 ("This report is subject to the following assumptions[.]").

- 22 -

examination to challenge the bases for expert's opinion regarding lost sales).[12]

D

Plaintiffs raise a similar objection to Weisheit's opinions concerning (1) repair costs, (2) unnecessary engineering and tooling costs, and (3) mitigation.[13]  These objections fail for the same reason.  For example, plaintiffs maintain that Weisheit's opinion regarding repair costs must be excluded because he assumes that Wilford "intentionally damaged" units but admitted that he was unaware of any machine that was intentionally damaged.  *See* Ps. 4/25/13 Br. Weisheit 22.  This contention misunderstands the nature of Weisheit's opinion.

---

[12]In a footnote, plaintiffs also contend that it was impermissible for Weisheit to make this assumption because he "relied solely on the representations of ThermoTek and its attorneys."  Ps. 4/25/13 Br. Weisheit 19 n.21.  For the same reason, the court declines to accept this argument.  Weisheit relied on ThermoTek's representation that he should provide a damages calculation on the assumption that Wilford was liable for breach of contract, fraud, and unfair competition.  Cases such as *Stinson Air Center, LLC v. XL Speciality Insurance Co.*, 2005 WL 5979096 (W.D. Tex. July 8, 2005), are inapposite because there is no indication that Weisheit failed to conduct an independent analysis of the *damages* question.  *See id.* at *3.  The record reflects that Weisheit performed an independent study of data provided to him by ThermoTek and that his analysis was based on conventional principles of financial analysis.  As a certified public accountant, Weisheit was qualified to perform these calculations.

[13]ThermoTek appears to offer Weisheit's opinion regarding mitigation to rebut plaintiffs' damages calculations in support of plaintiffs' breach of warranty claims.  As discussed *supra* at note 7, the court has previously granted partial summary judgment to ThermoTek, dismissing plaintiffs' claims for breach of implied warranty and limiting the claim for breach of express warranty to defects in materials and workmanship.  *See Orthoflex*, 2013 WL 4045206, at *4-5.  Notwithstanding the summary judgment ruling, the court does not consider ThermoTek's motion to strike Weisheit's mitigation opinion to be moot.  Weisheit's rebuttal opinion concerning mitigation is potentially relevant because the question whether the limitations provision failed of its essential purpose remains a contested issue in the case.  *See id.* at *7.

Weisheit is not offering an opinion about the *fact* of intentional damage; he is not an expert who inspected the machines.  As a certified public accountant, he is offering an opinion about the *amount* of damages; Weisheit analyzed financial data, and he is opining about repair costs, *assuming* the units were intentionally damaged.  Plaintiffs do not challenge the reliability of Weisheit's methodology (i.e., the principles of financial analysis applied or the computations made).  Nor do they contest the reliability of the financial data on which Weisheit relied.

E

Plaintiffs' final argument, made in a footnote, is that Weisheit's opinion on lost sales must be excluded because he did not render an opinion regarding the issue of manufacturing capacity.  Relying on state-law cases, plaintiffs contend that, without an analysis of ThermoTek's capacity, Weisheit cannot reliably opine about "hypothetical lost sales" because there is no reason to assume that ThermoTek could have satisfied increased demand for its products.

The court disagrees with plaintiffs' application of the case law.  For example, in *El Aguila Food Products, Inc. v. Gruma Corp.*, 131 Fed. Appx. 450 (5th Cir. 2005), a group of tortilla manufacturers brought an antitrust action against another manufacturer.  *Id.* at 451.  The plaintiffs' expert used a yardstick measure of lost profits.  He compared plaintiffs' sales history with sales data and growth projections from trade association studies of national tortilla markets and then applied a uniform gross margin to each plaintiff.  *Id.* at 453.  The model's critical assumption was that, absent the defendant's illegal conduct, each plaintiff

would have performed to the rate of the market as a whole.  The district court excluded the expert's testimony on two grounds: (1) it was unreliable because the model attributed all of the measured lost profits to the alleged antitrust injury, and (2) it was irrelevant because it was not anchored to the specific agreements or marketing practices that plaintiffs challenged.  *Id.*  The Fifth Circuit affirmed the district court.  *Id.*  It reasoned that the model was flawed and unreliable because the expert did not demonstrate the similarity of the plaintiffs to the other industry participants whose earnings data were used as the point of comparison, and the expert characterized any variance between the national earnings data and the plaintiffs' own sales data as "lost profits," ignoring the possibility that the variation had to do with other factors, such as the plaintiffs' own lack of capacity to satisfy increased demand.  *Id.*

Weisheit's methodology is not similarly flawed.  He neither used a yardstick measure of lost profits[14] nor based his conclusions on earnings data of other industry participants.  He tied his measurement of lost profits directly to the specific relationship between ThermoTek and plaintiffs.  And he did not assume a future projection of increased sales or increased demand.  His lost profits calculations assumed that ThermoTek's sales and profits would

---

[14]The two most common methods of quantifying antitrust damages are the "before-and-after" measure and the "yardstick" measure of lost profits.  *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000).  The before-and-after method compares the plaintiff's profit record before the violation with its profit record after the violation.  *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974).  The yardstick measure compares the profits of businesses that are "closely comparable" to the plaintiff's.  *Id.*  For the yardstick measure, "the business used as [the] standard must be as nearly identical to the plaintiff's as possible."  *Id.*  Although the terms do not apply directly to this case, conceptually, Weisheit's measure of lost profits is closer to the before-and-after measure than the yardstick measure.

have continued at the rate they were immediately before the pertinent events of this lawsuit. Accordingly, the court disagrees that Weisheit's failure to opine on capacity is a valid basis to exclude his testimony.

Because ThermoTek, as the proponent of the expert testimony, has shown that Weisheit's testimony is both relevant and reliable, and plaintiffs have not challenged his qualifications, the court denies plaintiffs' motion to strike Weisheit's testimony.

VI

The court turns next to ThermoTek's January 4, 2013 motion to strike expert testimony of Yates.

A

ThermoTek moves to strike Yates's testimony, which plaintiffs intend to offer to rebut Weisheit's damages calculations, discussed above. Plaintiffs offer Yates to opine that Weisheit's damages calculations regarding ThermoTek's unfair competition claim are flawed for various reasons. ThermoTek contends that Yates's testimony should be excluded because (1) he is not qualified to offer an opinion on unfair competition damages, and (2) he has not offered anything that qualifies as a "rebuttal opinion."

B

Plaintiffs maintain that the motion must be denied because ThermoTek did not attach the expert report of Weisheit—ThermoTek's damages expert—to the appendix in support of its motion. ThermoTek did, however, attach Yates's report and deposition transcript. According to plaintiffs, the failure to attach Weisheit's expert report requires that the court

deny ThermoTek's motion because, without the initial expert report, the court has no basis to evaluate the relevance and reliability of Yates's rebuttal testimony. The court disagrees.

Plaintiffs cite no authority for the proposition that ThermoTek's failure to include the expert report of its own witness is a reason to deny its motion to strike the testimony of plaintiffs' rebuttal expert. As the proponents of the rebuttal testimony, plaintiffs, not ThermoTek, have the burden of proof on this motion. *See, e.g., Johnson*, 685 F.3d at 459. If determining the reliability or relevance of Yates's testimony depends on considering Weisheit's testimony, then it is plaintiffs—not ThermoTek—who must include the pertinent portions of Weisheit's testimony in their appendix.

C

Before addressing the merits of ThermoTek's motion, the court turns to another preliminary matter: ThermoTek's conflation in its briefing of two distinct concepts—"rebuttal evidence," under Fed. R. Civ. P. 26(a)(2)(D)(ii), and reliability, under *Daubert* and Rule 702.

ThermoTek argues that Yates's opinions do not constitute "rebuttal opinions" and cites two cases that involve former Rule 26(a)(2)(C).[15] ThermoTek does not cite current Rule

---

[15]These cases are *Poly-America, Inc. v. Serrot International, Inc.*, 2002 WL 1996561 (N.D. Tex. Aug. 26, 2002) (Fitzwater, J.), and *Wireless Agents, L.L.C. v. Sony Ericsson Mobile Communications AB*, 2006 WL 5127278 (N.D. Tex. May 31, 2006) (Fitzwater, J.). Both construed Rule 26(a)(2)(C), which was amended in 2010. The current rule regarding rebuttal witnesses is Rule 26(a)(2)(D)(ii). *See* Rule 26 advisory committee's note (2010 Amendment) ("Subdivision (a)(2)(D). This provision (formerly Rule 26(a)(2)(C)) is amended slightly to specify that the time limits for disclosure of contradictory or rebuttal evidence apply with regard to disclosures under new Rule 26(a)(2)(C), just as they do with

26(a)(2)(D)(ii) and does not apply the three-question framework established in *Poly-America, Inc. v. Serrot International, Inc.*, 2002 WL 1996561 (N.D. Tex. Aug. 26, 2002) (Fitzwater, J.), for determining whether a disclosure is properly included as a rebuttal opinion, *see id.* at *15. Instead, ThermoTek applies *Daubert* and related cases, arguing that Yates's opinions are "*ipse dixit*." In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), the Supreme Court stated that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 146. ThermoTek's arguments are really about whether Yates is qualified and whether his testimony is reliable within the meaning of *Daubert* and Rule 702, not whether his opinions qualify as "rebuttal opinions" under Rule 26(a)(2)(D)(ii). There has been no argument about untimely disclosures, and plaintiffs have responded to the argument as if it were a challenge to the reliability of Yates's testimony. Accordingly, notwithstanding ThermoTek's citation to two Rule 26 cases, the court considers the arguments to be challenges to Yates's testimony under Rule 702.

---

regard to reports under Rule 26(a)(2)(B)." (italicized font omitted)).

    Although *Poly-America* addressed a *Daubert* issue, *see Poly-America*, 2002 WL 1996561, at *12-14, ThermoTek cites a different portion of the opinion that analyzes Rule 26. *See id.* at *15. ThermoTek does not discuss the part of *Poly-America* that deals with *Daubert*, and, so far as the court can determine, ThermoTek is not attempting to rely on the *Daubert* portion of *Poly-America*. And *Poly-America*'s discussion of *Daubert* is inapposite given the specific arguments ThermoTek advances.

    The other cited case, *Wireless Agents*, does not apply *Daubert* at all and expressly notes the difference between a challenge based on Rule 26 and one based on Rule 702. *See Wireless Agents*, 2006 WL 5127278, at *2 & n.4.

D

1

ThermoTek contends that Yates's testimony must be stricken because he is not qualified to offer any opinion about unfair competition damages and because the methodology on which he bases his opinion is not reliable.  ThermoTek posits that Yates lacks the requisite educational background because he is not a certified public accountant and lacks the necessary professional background because he works for a consulting firm that primarily does bankruptcy consulting.  ThermoTek also relies on the fact that Yates has never before been retained as an expert witness.  It contends that, even if Yates is generally qualified to opine about unfair competition damages, he is still not qualified to render an opinion in this case because he lacks particularized knowledge about the case: he did not interview Wilford or any of the entities accused of engaging in unfair competition, he only reviewed documents handpicked by plaintiffs' counsel, and he did not do the necessary investigation to reach an accurate conclusion about damages.  ThermoTek argues that, even if Yates is qualified to opine about this case, his testimony is unreliable because he does not base his conclusions on any identifiable methodology and does nothing more than repeat the legal conclusions of plaintiffs' attorneys.

2

Many of ThermoTek's arguments present insufficient grounds to exclude Yates's testimony.  They merely "affect the weight to be assigned [his opinion testimony] rather than its admissibility."  *Viterbo*, 826 F.2d at 422; *see also Lassiegne v. Taco Bell Corp.*, 202

F.Supp.2d 512, 515-16 (E.D. La. 2002) (noting that trial court's "role as a gatekeeper does not replace the traditional adversary system").  An expert need not be the most qualified in his field or even have graduate-level academic or professional training in a particular specialty to qualify as an expert.  *See Huss*, 571 F.3d at 452; *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1431-32 (5th Cir. 1989).  Although Yates is not a certified public accountant, he holds a Masters Degree in Business Administration from the J.L. Kellogg Graduate School of Management at Northwestern University.  Because he is being offered to testify about a form of economic damages, and this analysis merely requires that he apply accounting principles to the data the parties provided, his graduate degree in business administration and 20 years of management and consulting experience are sufficient to satisfy the threshold inquiry.  *Cf. Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881-82 (5th Cir. 2013) (holding that expert's computer science background and self-taught knowledge of software were sufficient qualifications for expert to testify about software programming in field of complex-services procurement).  In addition, the fact that he has not testified before as an expert does not automatically make him "unqualified."  *See Rolls-Royce Corp. v. HEROS, Inc.*, 2010 WL 184313, at *5 (N.D. Tex. Jan. 14, 2010) (Fitzwater, C.J.) ("[An expert's] lack of experience as an expert witness is no bar to his testimony.").  These reasons do not justify excluding Yates's testimony.

3

a

ThermoTek raises more serious challenges to the reliability of Yates's testimony.  It

argues that his rebuttal testimony about ThermoTek's theories of economic damages is

unreliable because he admits that he does not understand the concepts of "unjust enrichment"

and "disgorgement."  As supporting evidence, ThermoTek cites the following excerpt from

Yates's deposition:

> Q:     Do you have any understanding or do you know of the
>        generally accepted standards for calculation of forensic
>        damages in the industry?
> A:     I do not know.
> Q:     What are the, in your view, the proper measurements of
>        damages for unfair competition?
> A:     I do not know.
> Q:     Is lost profits a proper measurement of damages for an
>        unfair competition claim?
> A:     I do understand that lost profits are a piece of the puzzle
>        for such claims.
> Q:     Do you know what disgorgement is?
> A:     I do.
> Q:     Is disgorgement a proper measurement for damages for
>        unfair competition claim?
> A:     Can be.
> Q:     Do you understand what unjust enrichment is?
> A:     I do.
> Q:     What do you understand unjust enrichment to be?
> A:     Then I'll retract and say I do not understand what unjust
>        enrichment is.
> Q:     So what's your understanding of disgorgement?
> A:     I'll retract and say I don't understand what disgorgement
>        is.
> Q:     If disgorgement is obtaining the revenues or profits of a
>        company that is engaged in an improper action, how
>        would you calculate it?

* * *

A:      Well, I understand you have to ask questions and I'm
        happy to answer those.  I know I'm required to.  It would
        be nice to actually focus on the actual Weisheit report
        and the calculations that he made.  Could you refer to
        something of the way Weisheit calculated and have me
        comment on those specifics?

Q:      No, sir.  I want you to answer my question . . . .

A:      I do not know.  I would have to look at the specific
        situation and then by looking at that specific situation be
        happy to answer the question.  In general, I do not know.

D. 1/4/13 App. Yates 11-12 (objections omitted).  ThermoTek posits that Yates's repeated

attempts to steer the deposition toward a discussion about specific passages in Weisheit's

report was due to his not having any independent basis for providing his own damages

estimate.  ThermoTek also cites other excerpts from the deposition indicating that Yates did

not interview Wilford or any of his accountants, that he only looked at certain financial

documents selectively provided to him by plaintiffs' counsel, and that Yates relied

exclusively on conversations with plaintiffs' counsel to reach certain opinions in his report.

For example, Yates opines in his report: "In my opinion, given the fact that WMI is not a

party to the present lawsuit, to the extent that any of the determinations set forth in

[Weisheit's] Report rely upon the actions of WMI as a basis for ThermoTek's damages, such

determinations are inappropriate and unfounded."  D. 1/4/13 App. Yates 40.  Then, in his

deposition, Yates testified that the basis for this opinion was a conversation with plaintiffs'

counsel:

Q:      Okay.  First, what's the basis for your opinion?

A:      Conversations with counsel.

Q:      Do you have—you're not a lawyer, so you're not making

- 32 -

a legal opinion, right?

A:    I'm not.

Q:    So that opinion has as its foundation conversations with counsel that it would be inappropriate and unfounded?

A:    That is correct.

\*    \*    \*

Q:    So you're not making a legal assessment, you're just relying upon counsel's assessment?

A:    Yes.

D. 1/4/13 App. Yates 20.  ThermoTek maintains that Yates has not identified any particular methodology for arriving at his conclusions, has not reviewed the necessary materials to arrive at a reliable conclusion, has admitted that he does not understand concepts central to Weisheit's testimony, and has relied primarily, if not exclusively, on conversations with plaintiffs' counsel to form his opinions.  ThermoTek maintains that Yates is being called as an expert witness to do no more than present plaintiffs' theory of the case.

Plaintiffs respond to ThermoTek's arguments as follows:

> Not only does Mr. Yates provide his own opinions that rebut and contradict the assumptions and opinions offered by Mr. Weisheit, he also provides the bases for and evidence supporting his opinions.  ThermoTek tries to reduce the basis for Mr. Yates['s] opinions and assumptions to "common sense", relying on selected snippets of Mr. Yates['s] deposition testimony. However, a review of Mr. Yates's deposition shows that Mr. Yates did in fact provide the bases for his opinions and assumptions and repeatedly testified that his opinions and assumptions were supported by "reliable business principle[s]."

Ps. 2/8/13 Br. Yates 23 (citations to the appendix omitted).

b

The court concludes that plaintiffs have failed to carry their burden to establish that

- 33 -

Yates's proposed rebuttal testimony is reliable.  Neither Yates nor plaintiffs identify the

"reliable business principles" on which Yates purportedly relied.  In its motion, ThermoTek

expressly calls into question whether Yates has a reliable basis on which to offer his

opinions, and, in their response, plaintiffs fail to identify the specific methodology that Yates

used in forming his opinions.  Merely relying on "common sense" or the phrase "reliable

business principles" without any further specificity or explanation is insufficient to satisfy

plaintiffs' obligation to prove that Yates's testimony is the product of reliable principles and

methods.  After ThermoTek challenged the reliability of Yates's testimony, plaintiffs were

obligated to do more than cite Yates's conclusory assertions that he applied "reliable business

principles."  They have therefore failed to demonstrate that Yates's testimony is more than

subjective belief or unsupported speculation.  *See Nunn*, 2010 WL 2540754, at *2; *see also*

*Lasorsa v. Showboat: The Mardi Gras Casino*, 2009 WL 2929234, at *4-5 (D.N.J. Sept. 9,

2009) (granting motion to exclude expert testimony where, *inter alia*, expert's report lacked

any objective methodology); *Grdinich v. Bradlees*, 187 F.R.D. 77, 81-82 (S.D.N.Y. 1999)

(excluding expert testimony where expert relied on "industry standards" without identifying

specific industry standards to support conclusion).

Moreover, plaintiffs have failed to rebut ThermoTek's contention that Yates is being

called merely to present plaintiffs' trial arguments as expert opinions.  Although in forming

an independent opinion an expert can rely on information provided by a party's attorney,  an

expert cannot forgo his own independent analysis and rely exclusively on what an interested

party tells him.  *See, e.g., MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 2007 WL 150606,

at *4 (S.D. Tex. Jan. 16, 2007) (granting motion to exclude expert testimony where expert did not conduct independent analysis and instead relied primarily on what interested party told him); *Stinson Air Ctr., LLC v. XL Speciality Ins. Co.*, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005) (granting motion to exclude expert testimony where expert based opinions on representations of interested party and not on independent review of ordinary sources of financial analysis). Nor is it acceptable for a party to call a witness who, after synthesizing the party's trial arguments, presents them as expert opinions. *See, e.g., MGM Well Servs., Inc.*, 2007 WL 150606, at *4 (excluding expert where testimony was "an effort to synthesize [party's] positions and present them summarily as an expert opinion"). Plaintiffs respond to this argument by contending that ThermoTek is merely attacking the basis of Yates's opinions, and, as such, should present such challenges during cross-examination. But the opportunity for cross-examination is not of itself sufficient to cure expert testimony that is unreliable under *Daubert*. *See Daubert*, 509 U.S. at 596 ("These conventional devices, rather than wholesale exclusion . . ., are the appropriate safeguards *where the basis of scientific testimony meets the standards of Rule 702*." (emphasis added)). Plaintiffs have failed to adequately rebut ThermoTek's argument that Yates lacks a reliable methodology on which to base his opinions.

The court concludes that plaintiffs, as the proponent of Yates's testimony, have failed to establish that his rebuttal testimony regarding the damages calculations of Weisheit is reliable. Accordingly, the court grants ThermoTek's motion to strike expert testimony of

Yates.[16]

## VII

The court turns next to ThermoTek's January 4, 2013 motion to strike portions of the expert testimony of Dr. Vacroux.

## A

ThermoTek moves to strike two portions of Dr. Vacroux's testimony offered in support of Wilford's allegations concerning design defects in ThermoTek's products.[17] Plaintiffs offer Dr. Vacroux to testify that, based on his evaluation of ThermoTek's VascuTherm unit, the machine is defectively designed in multiple ways. ThermoTek argues that Dr. Vacroux's opinions regarding the design defects are irrelevant because he inspected two units that are not substantially similar to the ones at issue, and his opinions are unreliable because he conducted insufficient testing. Plaintiffs also offer Dr. Vacroux to testify that, based on his analysis of VascuTherm failure data, normal use of VascuTherm machines

---

[16]In its reply, ThermoTek argues that its motion to strike should be granted because plaintiffs do not offer any "admissible evidence" to carry their burden under *Daubert*. According to ThermoTek, plaintiffs' failure to include Yates's "affidavit or any other verification" in their response is a sufficient reason to strike Yates's testimony in its entirety. ThermoTek relies on *Rogers v. United States*, 2006 WL 616908 (W.D. Tex. Mar. 8, 2006), which notes that a court cannot consider unsworn and uncertified expert reports as a collateral attack on another expert or on summary judgment. *See id.* at *9. Because *Rogers*—a summary judgment decision—is distinguishable procedurally, the court overrules ThermoTek's objection.

[17]Plaintiffs offer Dr. Vacroux's testimony in support of their claims for breach of express warranty and breach of implied warranties. As explained *supra* at note 7, the court considers this testimony as if it might be offered in Wilford's defense on the fraud and unfair competition claims.

resulted in routine and repeated failure.  ThermoTek maintains that Dr. Vacroux's statistical opinions about an alleged failure rate are unreliable because they are based on flawed data and an unreliable methodology.

ThermoTek first challenges Dr. Vacroux's method of testing.  It argues that Dr. Vacroux's testimony is irrelevant because he inspected only two VascuTherm units and they are not substantially similar to the products at issue.  The first unit—Serial No. A21211 ("first unit")—was manufactured in May or June 2009 and given to Dr. Vacroux by Wilford. The second unit—Serial No. A09474 ("second unit")—was manufactured sometime before 2007 and purchased by Dr. Vacroux on eBay.  ThermoTek contends that Dr. Vacroux's analysis is irrelevant because the two units are dissimilar to the products at issue because they could have been altered or modified between the time of manufacture and testing. ThermoTek also maintains that, even if Dr. Vacroux's analysis is relevant, his testimony is unreliable because he bases his opinion on a small sample size and on units that are too old and have already been used for thousands of hours.

B

The court first considers ThermoTek's relevance objection.  In support of this argument, ThermoTek relies principally on two cases, both of which are distinguishable.  As discussed above, in *Hafstienn* the Fifth Circuit affirmed the district court's decision to exclude crash test evidence as irrelevant under Rule 401.  The district court concluded for several reasons that the test vehicle was not "substantially similar" to the one involved in the crash in question, and that the crash test occurred under dissimilar conditions.  *Hafstienn*, 194

- 37 -

Fed. Appx. at 212-13.  The Fifth Circuit noted that there were several "material differences between the accident and the crash test."  *Id.* at 213.  In the present case, however, it is undisputed that Dr. Vacroux analyzed the same model as the units at issue.  The units were designed and manufactured by ThermoTek, and, unlike the test vehicle in *Hafstienn*, there is no indication that the test units have different characteristics, such as length, weight, volume, or functionality.  The record does not establish that there are material differences between the units Dr. Vacroux analyzed and the ones at issue.

ThermoTek also relies on *Williams v. Briggs Co.*, 62 F.3d 703 (5th Cir. 1995).  In *Williams* the plaintiff sued, *inter alia,* the manufacturer of a water heater, alleging that a thermostat malfunction caused hot water to burn the victim.  *Id.* at 705.  The Fifth Circuit affirmed the district court's exclusion of evidence of a test performed by one of the plaintiff's experts.  *Id.* at 707.  The plaintiff asserted that the test showed that the thermostat had malfunctioned at the time of the accident.  *Id.*  The test used the same water heater as the one involved in the accident, but the test was performed two years later.  *Id.*  In the intervening years, various repairs had been made to the water heater, but the record did not clearly establish the type and extent of the repairs.  *Id.* at 707-08.  There was also evidence that the test occurred under circumstances that were plainly inconsistent with those at the time of the accident.  *Id.* at 708 n.3 (noting that test produced water at temperature of 200 degrees, but water was at most 155 degrees at time of accident).

*Williams* is more supportive of ThermoTek's position than is *Hafstienn*, but neither case warrants excluding Dr. Vacroux's challenged evidence.  ThermoTek argues that because

- 38 -

the passage of time in this case is even longer than in *Williams*, any analysis of the test units is irrelevant.   But this comparison of the relative passages of time is not dispositive. *Williams* does not stand for the proposition that the passage of time will *always* render a test irrelevant; in fact, the Fifth Circuit expressly held that, provided the record supports the ruling, the district court has discretion to decide the issue. *Williams*, 62 F.3d at 708 ("We need not linger long over the parties' debate about the precise significance of the repairs to the water heater, or the two-years' use between accident and testing. These matters are left to the sound discretion of the district court."). Here, although approximately two and one-half years (first unit) and five years (second unit) elapsed between the date of manufacture and the tests, the court cannot conclude that the passage of time produced material differences in the units tested.   Unlike in *Williams*, there is no evidence that the units had been repaired or modified by anyone other than ThermoTek,[18] and no evidence that the test units performed differently from how they did at the time of manufacture.[19]

_____

[18]The first unit was repaired by ThermoTek on several occasions after Wilford returned it, reporting various problems.   There is no evidence that any third party ever repaired or altered the test units.

[19]There is evidence suggesting that the first unit was not "in working order" when given to Dr. Vacroux.   But this fact does not justify exclusion.   Wilford appears to have returned this unit to ThermoTek in 2011 because of an alleged cooling problem with the device's reservoir.   ThermoTek disputes whether there was a problem with the reservoir, but it acknowledges that, at the time of the return, its employees determined that it would cost $1,182.40 to bring the unit into working condition.   Because this test unit is one of the units involved in the underlying suit, and ThermoTek admitted that this unit was not in working order during the time of the underlying events at issue, the court does not consider the fact that it was not in working order to be a material difference.   The record does not establish that the unit underwent any specific repairs or modifications affecting the product's

In reply, ThermoTek maintains that plaintiffs have the burden of showing substantial similarity. While it is true that plaintiffs, as the proponent of Dr. Vacroux's testimony, bear the burden of proof, *see Barnes*, 547 F.2d at 277, this does not mean that pure speculation by ThermoTek is sufficient to justify excluding Dr. Vacroux's testimony. There must be some indication that there are material differences between the product at issue and the product tested. In *Barnes* it was clear that the test had occurred under significantly different circumstances from the ones that existed at the time of the accident. But unlike the defendant in *Barnes*, ThermoTek has not shown that the test units have materially different *features* than the units at issue.

Accordingly, the court is unable to accept ThermoTek's contention that Dr. Vacroux's testimony should be excluded as irrelevant based on alleged dissimilarities between the test units and the units at issue.

## C

ThermoTek also challenges the reliability of Dr. Vacroux's testimony, contending that he conducted insufficient testing to support his conclusion. ThermoTek relies on the following three grounds: (1) Dr. Vacroux's opinions are based on only two units, which is too small a sample size on which to generalize about hundreds of ThermoTek products; (2) Dr. Vacroux merely "inspected" the units but did not actually "test" them; and (3) Dr. Vacroux's conclusions are based on incorrect assumptions or are contradicted by other

_____

functionality between the time ThermoTek inspected it and the time Dr. Vacroux inspected it.

testing evidence in the record.

To support its argument about sample size, ThermoTek relies on *Thomas v. Deloitte Consulting LP*, 2004 WL 1960097 (N.D. Tex. Sept. 2, 2004) (Kaplan, J.), but that case does not support excluding Dr. Vacroux's conclusions.  In *Thomas* a statistician was offered to testify about statistical evidence of discrimination in an employment discrimination case.  *Id.* at *3.  Judge Kaplan excluded the expert's testimony, in part because the statistician's results had a level of statistical significance that was weaker than what was typically required given the relatively small sample size.  But *Thomas* does not hold that generalizations based on small sample sizes must be excluded *per se*.  Rather, it suggests that allowing expert testimony based on a weaker-than-usual level of statistical significance is not justified in a case where the study suffered from an additional indicium of unreliability: small sample size.  *Cf. Overton v. City of Austin*, 871 F.2d 529, 544 (5th Cir. 1989) (Jones, J., concurring) ("Whether a given [test result] should be regarded as statistically significant must be determined on a case by case basis since the value signifying statistical significance is dependent upon sample size.").  That concern does not apply here because Dr. Vacroux is not offering an opinion about statistical significance nor is his opinion based on any kind of regression analysis.

Moreover, Dr. Vacroux's engineering opinion about the design of a particular model is supplemented by other evidence that he considered: failed parts that had been previously detached from VascuTherm machines, photographic evidence of "failure modes," internal ThermoTek reports, reports generated by ThermoTek regarding various failures it identified

in the VascuTherm machines, and third-party reports analyzing the design and functionality of the devices.  If the record established that the units Dr. Vacroux inspected were the only ones to use a particular design, or if Dr. Vacroux had analyzed only the two units in reaching his opinions, ThermoTek's position would be stronger.  But that is not what the record shows.  Therefore, the fact that Dr. Vacroux inspected only two units goes to the weight, not admissibility, of his opinion testimony, which ThermoTek can challenge through vigorous cross-examination and the presentation of contrary evidence.  *See Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

ThermoTek also argues that Dr. Vacroux's testimony is unreliable because he only "inspected" the units, but did not "test" them.  ThermoTek cites no authority explaining the distinction between "inspection" and "testing" and no case holding that, on these facts, *Daubert* requires "testing."  *See Kumho*, 526 U.S. at 150-51 (explaining that the *Daubert* factors do not establish a rigid checklist and testing is but one factor to be considered); *Sulak v. Am. Eurocopter Corp.*, 2012 WL 6567237, at *9 (N.D. Tex. Dec. 17, 2012) (Means, J.); *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1248 (M.D. La. 1996).  This is not a case where the expert has relied exclusively on *ipse dixit*.  *See Joiner*, 522 U.S. at 146.  It is undisputed that Dr. Vacroux inspected two units and analyzed numerous more failed parts and photographic evidence of failure modes.  In the circumstances of this case, the fact that he did not perform extensive scientific experiments to examine the functionality of the devices goes to the weight, not the admissibility, of his opinions.  *See Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

ThermoTek's final objection to the reliability of Dr. Vacroux's testing is that he failed to rule out alternative causes of product failures and ignored the only actual testing performed on the VascuTherm machines—testing performed by ThermoTek's experts. Neither argument warrants excluding his opinions. ThermoTek cites *Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000), and related cases to support the contention that Dr. Vacroux's failure to rule out alternative causes renders his opinions unreliable. But these cases are distinguishable because they involved situations where causation was an issue and the record established specific intervening events that an expert was aware of but did not rule out. In *Michaels*, for example, at least five significant intervening events occurred between the time of the installation and the time of the crash, all of which could have introduced contamination into the system. *Id.* at 753.

In the present case, however, the record does not establish specific intervening events that must be ruled out in order to test a theory of causation. For example, ThermoTek asserts that "[Dr.] Vacroux's generalized opinion about the cause of all corrosion wholly fails to negate a variety of other possible causes, such as the corroded parts coming into contact with tap water, spilled beverages, rain, or simply being placed in a wet sink to fill the reservoir." D. 1/4/13 Br. Vacroux 15. But there is no evidence in the record that establishes that these intervening events occurred. And although it is *possible* that these alternative causes explain the corrosion, Dr. Vacroux's ultimate conclusion that the machines exhibit a design defect does not *depend* on their susceptibility to corrosion. His expert report simply states, "in a number of . . . failed reservoir parts, rust on the reservoir flange is an *indication* of leakage

- 43 -

. . . in the vicinity of the bolt holes in the flange." Ps. 2/7/13 App. Vacroux 20 (emphasis added). Dr. Vacroux provides other reasons for concluding that the reservoir design was defective. ThermoTek's speculation that other causes might explain some of Dr. Vacroux's findings is not enough to justify exclusion.

ThermoTek's argument that Dr. Vacroux's testimony is unreliable because his conclusions either ignore other testing or are contradicted by other testing is likewise without merit. ThermoTek relies on *Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997), a products liability case where an expert was stricken because he did not test alternative designs before concluding that a product was unreasonably dangerous. *Id.* at 988-93. But *Watkins* is inapposite because it applies Mississippi products liability law, and the definition of "design defect" in such cases is different than in a case concerning warranty claims. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989) ("In the context of an implied warranty of merchantability case the word 'defect' means a condition of the goods that renders them unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy. In the area of strict products liability, however, the word 'defect' means a condition of the product that renders it unreasonably dangerous.").[20]

_____

[20]In 1993 the Texas Legislature enacted a statute defining "design defect" to mean the same thing in all "products liability actions." *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999); Tex. Civ. Prac. & Rem. Code Ann. § 82.005 (West 2011). Although a plaintiff can recover in a products liability action on a theory of breach of implied warranty, *see id.* § 82.001(2), that is still not the same claim as breach of implied warranty of merchantability, *see* Tex. Bus. & Com. Code. Ann. § 2.314 (West 2009). The latter sounds in contract, not in tort. *See JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 705 (Tex. 2008).

Under Texas law, a plaintiff bringing an action for a breach of implied warranty of merchantability does not need to prove that alternative designs were feasible and "does not [even] have to use direct evidence or expert opinion evidence to show that the goods had a defect." *Id.* (citing *Ford Motor Co. v. Tidwell*, 563 S.W.2d 831, 835 (Tex. App. 1978, writ ref'd n.r.e.)).  Here, plaintiffs have presented expert testimony, and, contrary to ThermoTek's characterization, it consists of more than conclusory assertions bereft of explanation or empirical basis.  And to the extent that ThermoTek's position is merely that Dr. Vacroux's opinions are contradicted by the testing results of ThermoTek's experts, it is not a viable *Daubert* objection.  In performing its gatekeeping role, this court should not focus on conclusions generated by the expert's methodology and should leave disputes between experts over the results to the trier of fact.  *See Nunn*, 2010 WL 2540754, at *4 ("The court is not to focus on the conclusions generated by the expert's methodology." (citing *Watkins*, 121 F.3d at 989)); *see also Viterbo*, 826 F.2d at 422 ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration.").

Because plaintiffs have established that Dr. Vacroux applied reliable principles and methods in his evaluation of the evidence he reviewed, the court denies ThermoTek's motion as to his engineering opinions about the existence of design defects in the units and parts he analyzed.

D

Finally, the court considers ThermoTek's challenge to the reliability of Dr. Vacroux's statistical opinions regarding the "failure rate." Unlike his engineering opinions concerning the test units and other failed parts discussed above, Dr. Vacroux's opinions regarding the failure rate fall within the realm of statistical evidence. As part of his analysis, Dr. Vacroux reviewed copies of Returned Material Authorization ("RMA") forms provided by ThermoTek during discovery. An RMA is generated when ThermoTek receives a VascuTherm unit for repairs. If, after receiving a VascuTherm machine from ThermoTek, the customer encounters a problem with the unit, it can return the machine to ThermoTek for inspection and any necessary repairs. Plaintiffs offer Dr. Vacroux's "failure rate" opinion,[21] based on a random selection of RMAs, that "normal use of VascuTherm machines resulted in routine and repeated failure, regardless of the company that purchased or the persons that operated those machines." Ps. 2/7/13 Br. Vacroux 10-11.

ThermoTek argues that the failure rate opinion must be excluded because it is based on unreliable data and an unreliable methodology. ThermoTek posits two principal objections. First, it contends that, because RMAs are only generated when products are returned for an alleged failure, Dr. Vacroux's data are not representative of the total population of VascuTherm machines in service (since many are never returned for repair). As such, it is improper for Dr. Vacroux to generalize about a failure rate for the total

_____

[21]Both parties characterize this opinion as the "failure rate" opinion, so the court will do so as well.

population of machines based on data derived from RMAs. Second, ThermoTek maintains that, even if the RMAs reflected a representative sample of the universe of machines, it is still improper to base a failure rate calculation on them because RMAs are generated every time a product is returned by a customer, before ThermoTek has inspected the device and concluded that it is faulty. The court agrees with both contentions.

Plaintiffs' response does not adequately address either objection. Instead of defending the reliability of the data set or the merits of Dr. Vacroux's methodology, plaintiffs argue that Dr. Vacroux's failure rate opinion is unassailable because it is based on data produced by ThermoTek.[22] Citing *General Electric Capital Business Asset Funding Corp. v. S.A.S.E. Military Ltd.*, 2004 WL 5495590, at *4 (W.D. Tex. Oct. 21, 2004), plaintiffs maintain that ThermoTek's objection is merely to the reliability of the data underlying an expert's opinion and that such an objection goes to weight of the evidence. The court disagrees.

The portion of *General Electric* that plaintiffs quote is actually an application of the Fifth Circuit's analysis in *Tyler v. Union Oil Co. of California*, 304 F.3d 379 (5th Cir. 2002). *See Gen. Elec.*, 2004 WL 5495590, at *4 (citing *Tyler*, 304 F.3d at 392-93). In *Tyler* the

---

[22]Plaintiffs also suggest that Dr. Vacroux's testimony should be admitted because the court ruled earlier that plaintiffs were not entitled to more robust sales data from ThermoTek during discovery. This is not a reason to deny ThermoTek's motion to strike. Plaintiffs moved to compel not only customer repair data but also specific information about each customer that had returned a product. Judge Stickney denied plaintiffs' motion to compel, noting that ThermoTek had agreed to produce the relevant repair data and that ThermoTek was not obligated to disclose its confidential customer information. *See Orthoflex v. ThermoTek, Inc.*, No. 3:11-CV-0870-D, slip op. at 1 (N.D. Tex. Nov. 15, 2011) (Stickney, J.). The identity of customers is irrelevant to the failure rate opinion at issue.

Fifth Circuit affirmed the district court's decision to admit statistical evidence presented by one of the plaintiff's experts. *Tyler*, 304 F.3d at 393. The defendant criticized the methodology on several grounds: that the expert created his own database from materials he received from the defendant, the expert's regression analysis failed to control for several variables, the expert's model used age as a continuous variable, and the expert's opinion was discredited by analysis from another expert. *Id.* at 392-93. The Fifth Circuit held that the district court did not abuse its discretion by admitting the evidence, observing that the expert's database was not itself unreliable, the expert controlled for multiple relevant factors, the expert performed other tests where age was not a continuous variable, and the expert's conclusion was not entirely discredited by the evidence from the other side's expert. *Id.*

In the present case, by contrast, Dr. Vacroux's testimony is not based on reliable principles and methods because these data are themselves unreliable. ThermoTek's first argument is essentially an argument about "sampling bias," which is a subtype of selection bias. Selection bias occurs when "there is a systematic difference between those [observations] included in the study and those [that] are not." *In re TMI Litig.*, 193 F.3d 613, 707 (3d Cir. 1999) (citation and internal quotation marks omitted); *see also Reference Manual on Scientific Evidence* at 296, 582-85 (3d ed. 2011). ThermoTek's argument is that the sample Dr. Vacroux used to justify a conclusion about the failure rate for *all* ThermoTek products included *only* those products that had been returned for an alleged failure: a subset that had a greater-than-average probability of exhibiting a problem. This type of systematic difference between the observations included in the study versus those that are not renders

expert testimony based on these data unreliable.  *See, e.g., Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *9-11 (S.D. Ind. Sept. 18, 2006) (holding that selection bias rendered expert testimony inadmissible).  The fact that Dr. Vacroux chose observations randomly from the RMA database does not cure the problem.  If the database is created by selecting observations in a nonrandom way, selecting a subset of these observations randomly does not make the sample representative of the greater population.  Here, the data set was selected *nonrandomly* on the basis of the RMAs.  Dr. Vacroux's methodology did not account for this mode of selection.

The court also agrees with ThermoTek's second argument.  There is "too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146; *Johnson*, 685 F.3d at 460-62.  Dr. Vacroux bases his opinion about the failure rate of ThermoTek's VascuTherm machines on a random selection of RMAs.  But it is undisputed that RMAs are generated every time a VascuTherm machine is returned by a customer, regardless of whether the returned product actually exhibits a problem.  Because the form is created before a ThermoTek technician analyzes the unit, the fact that an RMA is generated does not necessarily reflect that the device is in need of repair, much less that a certain unit exhibits a design defect.  Customers can misdiagnose what they think are problems, return products that failed because they misused them, or return products that experienced problems only because of normal wear and tear.  Because an RMA is generated when ThermoTek *receives* the unit and not when a ThermoTek technician analyzes it, the RMA does not alone provide reliable information about whether the unit actually exhibited a defect.  There is

therefore too great an analytical gap between the information that the RMA provides and Dr. Vacroux's opinion. Accordingly, even if sampling bias were not a sufficient reason to exclude Dr. Vacroux's failure rate opinion testimony, the court would still conclude that plaintiffs have failed to show that Dr. Vacroux's testimony regarding the failure rate is based on reliable principles and methods.

The court therefore grants in part and denies in part ThermoTek's motion to strike certain portions of Dr. Vacroux's testimony.[23]

VIII

The court now turns to ThermoTek's January 4, 2013 motion to strike portions of the expert testimony of Durako.

A

Plaintiffs intend to offer Durako's testimony to support their allegations concerning design defects in ThermoTek's products,[24] specifically, that the VascuTherm System is defective in design and construction. ThermoTek objects to three major portions of Durako's testimony, reflected in the following opinions: (1) "the VascuTherm system has experienced

_____

[23]In its reply, ThermoTek argues that its motion to strike should be granted because plaintiffs do not offer any "admissible evidence" to carry their burden under *Daubert*. According to ThermoTek, plaintiffs' failure to include Dr. Vacroux's "affidavit or any other verification" in their response is a sufficient reason to strike Dr. Vacroux's testimony in its entirety. On the basis discussed *supra* at note 16, ThermoTek's objection is overruled.

[24]Plaintiffs offer Durako's testimony to support their claims for breach of express warranty and breaches of implied warranty. As discussed *supra* at note 7, these claims have either been dismissed or modified, so the court considers this testimony as if it might be offered in Wilford's defense on the fraud and unfair competition claims.

a poor record for reliability under ordinary use"; (2) "the selection and use of [acrylic butadiene styrene ("ABS")] resin as the material for the construction of the reservoir of the VascuTherm [machine] was improper"; and (3) "a number of design changes could have been implemented to eliminate the defects in the VascuTherm system and avoid the routine damage experienced by VascuTherm users."  D. 1/4/13 App. Durako 31-32.

## B

ThermoTek raises many of the same objections to Durako's testimony that it does to Dr. Vacroux's.  For the reasons discussed in § VII(B)-(C), the court does not agree with ThermoTek that Durako's testimony must be stricken because he (1) tested VascuTherm units that were three to four years old, (2) merely "inspected" the units but did not "test" them, and (3) ignored the contrary testing results of ThermoTek's experts.  These objections go to the weight, not the admissibility, of the evidence and can be addressed through vigorous cross-examination and the presentation of contrary evidence.  *See Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.  Accordingly, the court denies ThermoTek's motion as to Durako's opinions about the units (and parts) he inspected.

## C

ThermoTek next argues that portions of Durako's testimony are unreliable because there is too great an analytical gap between his inspection of three VascuTherm units and his generalization about the performance record of the VascuTherm System generally.  Plaintiffs do not address this argument in their response.  They fail to explain why the units Durako selected are representative of the total population of VascuTherm machines and how

Durako's methodology allowed him to reasonably opine about "routine failure" and a "poor record of reliability" based on just three observations.  Instead, plaintiffs merely invoke the general rule that challenges to the basis of an expert's opinions go to weight rather than admissibility.  *See, e.g.,* Ps. 2/7/13 Br. Durako 14.  Although this principle is true generally, it is well established that in cases where the analytical gap between the basis for the opinion and the expert's conclusion is too great, the district court may exclude the opinion as unreliable.  *See, e.g., Knight*, 482 F.3d at 355.  This is not a case like *Wackman* because Durako does not acknowledge the analytical gap between the basis for his opinions (the inspection of three units) and his conclusion (a generalization about the performance history of thousands of units).  *See Wackman*, 602 F.3d at 402-03 (concluding that some analytical gaps, where they are acknowledged by the expert and explained, go to the weight of the evidence rather than to admissibility).  As the proponents of Durako's testimony, plaintiffs are obligated to demonstrate that Durako's opinions are reliable.  They have failed to address a serious objection to parts of his proposed testimony.

Accordingly, the court grants ThermoTek's motion as to Durako's opinions about "routine failure" and a "poor record of reliability."  In addition to his inspection of the three units, Durako reviewed, *inter alia*, three reports that had been previously provided to Wilford by Durako's employer, Materials Engineering, Inc. ("MEi").  The court's decision does not preclude Durako from testifying based on these reports, and he may testify that the reports, coupled with his own analysis, support his opinion that the VascuTherm System was defectively designed.  Durako may not testify, however, about the historical performance

record of the VascuTherm System because he did not conduct or review any longitudinal study of VascuTherm devices.

D

ThermoTek also contends that Durako's testimony concerning the purported incompatibility of the reservoir material with the liquid used in the reservoir is unreliable. In his expert report, Durako concludes that "[t]he selection of ABS in conjunction with the reservoir design and the use of an isopropyl-alcohol/water solution led to the routine and repeated failures of the reservoirs." D. 1/4/13 App. Durako 31 (quoting expert report of Durako). ThermoTek maintains that this conclusion is based on an unreliable methodology because Durako failed to distinguish among the numerous grades of ABS and the possible concentrations of isopropyl alcohol.

Regarding the ABS grades, ThermoTek relies exclusively on citations to the rebuttal report and affidavit of its expert, Dr. Shipley. *See* D. 1/4/13 Br. Durako 8. These citations do not establish factually that there are numerous grades of ABS and that differences in the grades necessarily affect compatibility. Durako did not consider, much less adopt, either submission in forming his opinion. As such, the court declines to exclude Durako's opinion on this basis.

By contrast, the record establishes that different concentrations of isopropyl alcohol *can* affect compatibility. ThermoTek cites a report, relied upon by Durako and produced before this lawsuit by MEi, explicitly stating that the VascuTherm device analyzed by MEi "circulates a heated or cooled 90% water / 10% isopropanol liquid mixture to apply pressure

that aids in wound recovery." D. 1/4/13 App. Durako 48.  But in formulating his opinion in this lawsuit, Durako bases his conclusion on studies that, according to ThermoTek, tested a 98% isopropyl alcohol solution—a significantly stronger concentration.  ThermoTek contends that a conclusion about a 10% mixture cannot be reliably based on a 98% mixture, which is a significantly more aggressive chemical composition.

Plaintiffs do not adequately address this argument in their response.  They merely reiterate Durako's opinion several times, *see* Ps. 2/7/13 Br. 4-6, 18, and reply that both ThermoTek's internal reports and "published industry guides" have concluded that ABS and isopropyl alcohol are incompatible, *id.* at 18-19.  Plaintiffs fail to respond to the specific objection that the basis for Durako's opinion is about a materially different chemical composition.  In fact, he cites to the same study that ThermoTek cites.  It is clear that the compatibility test in that study relates to a 98% isopropyl alcohol mixture.  *See* Ps. 2/7/13 App. Durako 63 (referring to "Table-2 Chemical Resistibility of 'TOYOLAC' GP Grade").  ThermoTek's internal reports likewise fail to support plaintiffs' argument because ThermoTek's study concluded that a 70% isopropyl alcohol mixture would be incompatible with the ABS resin (presumably, one of the very reasons ThermoTek chose such a diluted mixture to recommend as the liquid for its reservoirs).  *See* D. 2/21/13 Reply Br. Durako 4-5.  Plaintiffs do not argue that the chemical characteristics of a 98% isopropyl alcohol mixture are similar to those of a 10% mixture, nor do they contend that Durako's methodology otherwise accounts for this difference.  Given that Durako's own report establishes that the VascuTherm System uses a 10% isopropyl alcohol mixture, while his opinion concerning

compatibility is based on tests involving a 98% solution, plaintiffs' failure to respond to this objection materially undercuts the required showing that his compatibility opinion is reliable. Because plaintiffs have failed to make the necessary showing that Durako's compatibility opinion is reliable, the court grants ThermoTek's motion to exclude this opinion.

E

Durako also opines that a number of alternative designs could have avoided the alleged defects in ThermoTek's products.  ThermoTek raises several objections based on reliability and relevance, but the court need not reach them.  Instead, the court denies ThermoTek's motion to strike Durako's opinion as moot because the existence of an alternative design is not relevant to any of the remaining claims in the litigation (breach of express warranty, fraud, breach of contract, and unfair competition).

Thus the court grants in part and denies in part ThermoTek's motion to strike certain portions of Durako's testimony.[25]

IX

Finally, the court addresses ThermoTek's January 4, 2013 motion to strike expert testimony of Dr. Venerus.

---

[25]In its reply, ThermoTek argues that its motion to strike should be granted because plaintiffs do not offer any "admissible evidence" to carry their burden under *Daubert*. According to ThermoTek, plaintiffs' failure to include Durako's "affidavit or any other verification" in their response is a sufficient reason to strike Durako's testimony in its entirety.  On the basis discussed *supra* at note 16, ThermoTek's objection is overruled.

A

Plaintiffs intend to offer Dr. Venerus to rebut the testimony of Dr. Shipley concerning the substantial equivalence of ThermoTek's and Wilford's products.  Dr. Venerus intends to testify that Dr. Shipley's opinion that Wilford did not reverse engineer ThermoTek's products is flawed for various reasons.  ThermoTek seeks to exclude the testimony on several grounds: (1) Dr. Venerus does not offer an actual "rebuttal opinion" because he merely disagrees with Dr. Shipley's conclusions without challenging Dr. Shipley's methodology, (2) Dr. Venerus' testimony is unreliable because he does not identify a specific methodology on which he bases his conclusions, (3) plaintiffs are calling Dr. Venerus merely to cloak their trial arguments under the guise of expert testimony, and (4) Dr. Venerus' testimony constitutes impermissible legal conclusions.

B

1

ThermoTek contends, first, that Dr. Venerus is not offering a "rebuttal opinion" because he merely disagrees with Dr. Shipley's conclusions without challenging his methodology.  As discussed in § VI(C), the court understands ThermoTek's argument to be a challenge under Rule 702 rather than under Rule 26(a)(2)(D)(ii) because there is no argument about an untimely disclosure.  Thus the court considers ThermoTek's position as an objection to the relevance of Dr. Venerus' testimony—that is, a contention that, because Dr. Venerus is not actually rebutting the testimony of Dr. Shipley, it will not assist the trier of fact in understanding the evidence or determining a fact in issue.

According to ThermoTek, Dr. Venerus intends to opine that Dr. Shipley's test was too simple, and this opinion does not actually rebut Dr. Shipley's testimony because it does not challenge the reliability of Dr. Shipley's methodology.   The court disagrees with ThermoTek's characterization of Dr. Venerus' testimony, and therefore declines to accept ThermoTek's first ground for excluding his testimony.   Dr. Venerus is not being offered merely to testify that Dr. Shipley's testing was too simple.   He is being offered to opine that, given that Dr. Shipley's testing is based on simple and publicly-available techniques, it does not support the inference that Wilford could not have reverse engineered the products at issue.   In other words, Dr. Venerus is being offered to rebut Dr. Shipley's conclusion that the substantial equivalence of the products *implies* that Wilford used ThermoTek's information. Thus Dr. Venerus is being called to rebut an "inferential leap" in the reasoning of Dr. Shipley.   *Cf. Huss*, 571 F.3d at 455 (rebuttal expert called to testify that another expert's "inferential leap" was unsupported by scientific literature).

Dr. Venerus is also being offered to testify that Dr. Shipley's methodology was not based on commonly accepted scientific methods or principles for determining substantial equivalence.   This testimony qualifies as a "rebuttal opinion" because it impeaches the testimony of Dr. Shipley, and it is relevant because it will assist the trier of fact in determining whether the equivalence between the products, as measured by Dr. Shipley, is a reliable basis for inferring that Wilford used information disclosed by ThermoTek.   *See id.* at 455-56 (holding that exclusion of rebuttal expert called "to rebut an untenable conclusion" was abuse of discretion); *see also Rolls-Royce*, 2010 WL 184313, at *11 (denying motion

to exclude opinion that business method could be obtained by reverse engineering even though expert did not analyze all products at issue).

2

ThermoTek argues, second, that Dr. Venerus' testimony is unreliable because he does not identify a specific, alternative methodology as the basis for his opinions. It cites an excerpt from Dr. Venerus' deposition in which he acknowledges that he did not perform any dimensional comparisons, take any measurements, or do any testing. It is not clear from this record, however, that any of these steps was required for Dr. Venerus to render a reliable opinion. Dr. Venerus is a Professor of Chemical Engineering at the Illinois Institute of Technology and holds a Ph.D. in Chemical Engineering from Pennsylvania State University. He is qualified to render engineering opinions about the principles and methods that Dr. Shipley applied in his expert report. That Dr. Venerus did not conduct his own experiments or testing does not necessarily mean that his testimony concerning Dr. Shipley's testing is unreliable. For example, in his report, Dr. Venerus explains the purpose and design of the tests that Dr. Shipley used,[26] and he opines about the implications of the tests, as recognized by the engineering community. Dr. Venerus also identifies several differences between some of the wraps, and he suggests that Dr. Shipley understated or overlooked these differences in rendering his opinion concerning substantial equivalence. Dr. Venerus states that this

---

[26]According to Dr. Venerus' expert report, Dr. Shipley performed a Fourier Transform Infrared Spectroscopy test and a Differential Scanning Calorimetry test. D. 1/4/13 App. Venerus 14.

opinion is based on reviewing Dr. Shipley's analysis and on Dr. Venerus' own inspection of Wilford's wraps. The court therefore concludes that Dr. Venerus is offering "more than subjective belief or unsupported speculation." *Nunn*, 2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590) (internal quotation marks omitted). ThermoTek's objections concerning the basis for Dr. Venerus' opinion and his failure to conduct alternative testing go to the weight, not admissibility, of his testimony and can be addressed through vigorous cross-examination and the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

3

ThermoTek maintains, third, that Dr. Venerus' testimony is unreliable because it merely restates plaintiffs' trial arguments under the guise of expert testimony. ThermoTek contends that Dr. Venerus relied exclusively on documents handpicked by plaintiffs' counsel and did not conduct an independent investigation into the facts. It posits that Dr. Venerus should not be permitted to testify about the Recovery+ unit and ThermoTek's 510(k) application.[27]

Dr. Venerus' expert report does not mention the Recovery+ unit, and plaintiffs do not argue in response that Dr. Venerus is being offered to testify about this device. The court therefore declines to address this objection. If Dr. Venerus is asked to opine at trial about the Recovery+ unit, ThermoTek can raise an objection that Dr. Venerus lacks a reliable basis

---

[27]As discussed in § VI(D), ThermoTek raises a similar objection to Yates's testimony, but its showing as to Dr. Venerus is not as strong as it is for Yates.

to testify about it given his deposition testimony that he had never before seen one and did not know what it was.

Turning to the 510(k) application, ThermoTek argues that Dr. Venerus admitted that he had never seen such an application before this lawsuit, that this particular application had no specific connection to any specific feature of his report, and that the portion of his expert report that mentions the application was "apparently written by Wilford's attorneys."  D. 1/4/13 Br. Venerus 8.  The court declines to accept ThermoTek's argument as a basis for excluding his testimony.

The excerpts from Dr. Venerus' deposition do not establish that his testimony concerning the application is unreliable.  Dr. Venerus testified that he could not "make a specific connection between [his] report, the 510(k) [application], and some specific feature of [his] report."  D. 1/4/13 App. Venerus 54.  But the absence of such a connection does not of itself render his opinion testimony unreliable.  Nor does the fact that Dr. Venerus had not seen a 510(k) application before this lawsuit make his testimony unreliable.  ThermoTek does not posit that a lack of familiarity with 510(k) applications makes Dr. Venerus unqualified to testify about the subject matter.  And ThermoTek's suggestion that the references to the 510(k) application must have been written by plaintiffs' counsel is too speculative to justify exclusion.  Dr. Venerus' expert report and deposition testimony reflect that he considered the 510(k) application, did not base his opinions solely on information contained in the application, and did not merely rely on plaintiffs' counsel to reach his conclusions.  The court therefore declines to accept ThermoTek's position that Dr. Venerus'

testimony should be excluded on the ground that he is merely restating the trial arguments of plaintiffs' counsel.

4

ThermoTek posits, fourth, that Dr. Venerus' testimony should be stricken insofar as it contains opinions that are inadmissible legal conclusions.  The court agrees that some of Dr. Venerus' testimony should be excluded as inadmissible legal conclusions.

ThermoTek argues that Dr. Venerus should not be permitted to opine that ThermoTek's design information was not confidential or proprietary.  It also posits that Dr. Venerus should not be permitted to opine that Dr. Shipley's conclusions with respect to certain features of some of the wraps are "not germane to the issues in this case."  *See, e.g.,* D. 1/4/13 App. Venerus 27 (quoting expert report of Dr. Venerus).  The court agrees. Although Dr. Venerus may offer opinions about whether certain information can be found in the public domain, *see Rolls-Royce*, 2010 WL 184313, at *12, he cannot offer the legal conclusion that "[t]here is certainly nothing confidential, nor secret, about such material or its use," D. 1/4/13 App. Venerus 19 (quoting expert report of Dr. Venerus).  Dr. Venerus also cannot offer the legal conclusion about germaneness, which is essentially a legal opinion about the relevance of certain issues in the case.  Both opinions attribute legal significance to certain facts, which is not helpful to the trier of fact and must be excluded under Rule 702. *See C.P. Interests, Inc. v. Ca. Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001) (citing *Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)).

The court therefore grants in part and denies in part ThermoTek's motion to strike Dr.

Venerus' testimony.[28]

*   *   *

For the reasons explained, the court decides the motions as follows:

(1) ThermoTek's January 4, 2013 motion to strike expert testimony of Yates is granted;

(2) ThermoTek's January 4, 2013 motion to strike portions of the expert testimony of Durako is granted in part and denied in part;

(3) ThermoTek's January 4, 2013 motion to strike portions of the expert testimony of Dr. Vacroux is granted in part and denied in part;

(4) ThermoTek's January 4, 2013 motion to strike expert testimony of Dr. Venerus is granted in part and denied in part;

(5) plaintiffs' April 25, 2013 motion to strike portions of the proffered expert testimony of Weisheit is denied;

(6) plaintiffs' May 1, 2013 motion to strike portions of the proffered expert testimony of Dr. Shipley is denied; and

(7) plaintiffs' May 1, 2013 motion to strike portions of the proffered expert testimony of Dr. Shipley in rebuttal to the claims of plaintiffs is denied in part on the merits and

---

[28]In its reply, ThermoTek argues that its motion to strike should be granted because plaintiffs do not offer any "admissible evidence" to carry their burden under *Daubert*. According to ThermoTek, plaintiffs' failure to include Dr. Venerus' "affidavit or any other verification" in their response is a sufficient reason to strike Dr. Venerus' testimony in its entirety.  On the basis discussed *supra* at note 16, ThermoTek's objection is overruled.

denied in part as moot.

**SO ORDERED.**

November 20, 2013.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE